UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

VARDAN ABRAMYAN,

             Petitioner,

     v.

TIM V. VIRGA, Warden,

             Respondent.

No.  2:13-cv-0258 JAM DAD P

FINDINGS AND RECOMMENDATIONS

Petitioner is a state prisoner proceeding through counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered against him on August 14, 2009 in the Sacramento Superior Court on charges of conspiracy to commit murder and murder while armed with a firearm, with the special circumstances that the murder was intentional and carried out for financial gain and that petitioner and his co-defendants intentionally killed the victim while lying in wait.  Petitioner seeks federal habeas relief on the grounds that his trial counsel rendered ineffective assistance and the trial court violated his right to due process in failing to instruct the jury on imperfect self-defense and imperfect defense of others.  Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

/////

/////

1

## I. Background/Prior Proceedings

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

Norik Abramyan (Norik) was shot and killed by two assailants as he sat in his car in the parking lot of a Hollywood Video store. The two assailants, defendant Arthur James Battle III and Jason Dillingham, the latter not involved in this proceeding, were hired by defendant Isaiah Dupree Barron, who was hired by Norik's son, defendant Vardan Abramyan (Abramyan), to commit the murder. Convicted by separate juries of conspiracy to commit murder and murder with special circumstances, the three defendants appeal. We consolidated the appeals for argument and decision only.

As to each defendant, we strike the parole revocation fine imposed and suspended pursuant to Penal Code section 1202.45. Imposition of the fines was improper because each defendant was sentenced to an indeterminate term of life without parole.

Except for their contentions concerning the parole revocation fines, the defendants' contentions on appeal reveal no prejudicial error. We therefore modify each judgment and affirm.

**FACTS[1]**

Abramyan approached Barron, an acquaintance, about killing Norik. He agreed to pay Barron $4,000 for the killing and, a few days before the killing, gave Barron $200. The evening before the killing, Abramyan gave Barron an additional $1,800. Abramyan asked Barron if Barron was going to commit the killing alone, and Barron replied, "Don't worry about it."

Barron recruited Battle and Dillingham to assist him in killing Norik. He offered, and eventually paid, each of them $500.

On July 30, 2006, Lawrence Stringer accompanied Barron, Battle, and Dillingham to a liquor store. Barron told Stringer that they were going to kill someone for money. Stringer said that he did not want to be involved. Barron, Battle, and Dillingham each had a handgun.

The car, carrying Barron, Battle, Dillingham, and Stringer, stopped at an apartment complex. All but Stringer left the car and walked into the complex where they met with Abramyan. A short time later, Barron, Battle, and Dillingham returned to the car. Norik drove up and walked into the complex. Barron, Battle, and Dillingham followed on foot, but they soon came running back to

---

[1]  These facts are taken from evidence presented to all three juries. Additional facts relevant to individual defendants are recounted later.

2

the car and said that they had not shot Norik because there were other people around.

Abramyan called Barron by cell phone, and they agreed to meet at the Hollywood Video store where Abramyan would bring Norik. Barron, Battle, Dillingham, and Stringer drove to the Hollywood Video store and parked behind the store. Barron, Battle, and Dillingham agreed that Battle and Dillingham would do the shooting and Barron would be the driver.

Abramyan and Norik arrived at Hollywood Video in a white Kia and went into the store. After a while, they returned to the car, but Abramyan told Norik that he had to go back into the store to use the restroom. Abramyan again returned to the car but went back into the store, telling Norik he left his cell phone in the restroom.

Meanwhile, Battle and Dillingham walked around to the front of the store, while Barron and Stringer waited in the car behind the store. After waiting for a while, Barron drove around to the front of the store. He spoke to Battle and Dillingham, who were smoking cigars, and encouraged them to shoot Norik. Barron then drove back behind the store to wait. After a few more minutes, Barron told Stringer to go get Battle and Dillingham because, in Stringer's words, "they weren't going to do it." Stringer got out of the car, but before he could walk around the car he heard gunshots.

Battle and Dillingham had waited in the parking lot for a total of about 30 minutes, anxious and pacing, with gloves on and bandanas around their necks. When Norik was alone in the car, Battle and Dillingham put the bandanas up over the lower part of their faces, drew handguns, and ran toward the car, with Dillingham ahead of Battle. They stopped next to the car, on the driver's side, and shot at Norik. Battle and Dillingham then returned to the car driven by Barron, and they sped away.

Norik died at the scene.

After the murder, Abramyan arranged to have the last $2,000 delivered to Barron.

**PROCEDURE**

The district attorney filed an amended information charging Battle, Barron, and Abramyan with conspiracy to commit murder (count one; Pen. Code, §§ 182, subd. (a)(1); 187, subd. (a)); and murder with financial-gain and lying-in-wait special circumstances (count two; Pen. Code, §§ 187, subd. (a); 190.2 subd. (a)(1) & (15)). As to each count, it was further alleged that Battle personally discharged a firearm causing death (Pen. Code, § 12022.53, subd. (d)) and Barron and Abramyan were involved in an offense in which a principal was armed (Pen. Code, § 12022, subd. (a)(1)).

Battle, Barron, and Abramyan were tried jointly, but each had a separate jury. The juries found each defendant guilty on both

counts and found all enhancement and special circumstance allegations true.[2]

* * *

The trial court sentenced Abramyan to life without possibility of parole on count two, with an additional year for the arming of a principal. On count one, the court imposed an indeterminate term of 25 years to life, with an additional year for the arming of a principal. The sentence on count one was stayed pursuant to Penal Code section 654.

People v. Battle, 198 Cal.App.4th 50, 56-58 (2011).

Petitioner testified at his trial. Among other things, he explained the physical and verbal abuse suffered by him and his family members at the hands of his father, victim Norik Abramyan. Petitioner's trial counsel also called an expert witness to testify regarding the impact of this abuse on petitioner. The California Court of Appeal summarized this testimony as follows:

Abramyan testified on his own behalf and produced the testimony of his sisters and his mother concerning Norik's long-term abuse of the family members. He also had an expert testify concerning the effect of such long-term abuse on Abramyan.

Abramyan's mother, Siran, married Norik in an arranged marriage in Armenia. They came to the United States in 1990.

Abramyan was born in 1987, and was 19 years old when Norik was killed. He has three sisters, Anna (born in 1985), Ani (born in 1989), and Alina (born in 1991).

We need not recount in detail Norik's abuse of his wife, daughters, and Abramyan, as reflected in the testimony of Abramyan, his mother, and his sisters. At the same time, we do not mean to minimize the extent of the abuse.

Norik was strict and domineering from the beginning of his marriage to Siran. He treated her like a slave. He beat her daily for anything and nothing at all and threatened to kill her. He treated the children the same way and sought to control them financially, even after they moved away and got their own jobs. The mental, physical, and emotional abuse caused Abramyan to feel hopeless, worthless, and, at times, suicidal.

A couple days before the killing, Norik became enraged at 15–year–old Alina over a trivial matter. He kicked her repeatedly, then grabbed her by the hair and hit her. Abramyan and Anna tried to

---

[2]  Jason Dillingham was tried and convicted separately of first degree murder with special circumstances and an enhancement for personal discharge of a firearm causing death. This court affirmed his conviction. (People v. Dillingham, 2009 WL 2521163 (C058682, Aug. 19, 2009).)

1

2

> stop the beating, but Norik turned on them. Norik hit Abramyan, who fell to the floor and lost consciousness for a few seconds. After this, Abramyan wanted Norik "gone."

3

4

5

6

7

8

9

10

11

12

> Abramyan offered expert testimony on intimate partner battering. Questioned concerning the effects of violence and victimization on a child, the expert testified: "They can be many. Mostly what we see are children who experience effects of trauma. So, we often see children who are anxious, have nightmares, feel hyper-vigilant about – which means that they're constantly scanning their environment for danger, because some of that's real, some of that's perceived. [¶] So we have children who grow up knowing – knowing that there's violence in their lives and anticipating future violence which effects [sic] their perceptions of the world and their safety in the world." The expert stated that a person who had been abused and had witnessed abuse would "develop [ ] a sense of what's escalating danger in his family because he's experienced, he's seen it. [¶] And so his perception of dangerousness would be lightened by his own experience. And if something happened or series of events happened that caused him to see that abuse escalating based on that experience then it would make sense in his world and his mind for him to believe that he needed to protect those around him and himself."

13 Id. at 70-72.

14       Through counsel, petitioner appealed his judgment of conviction. In a published opinion,

15 the California Court of Appeal modified the judgment by striking a parole revocation fine

16 imposed by the sentencing court, and affirmed the judgment in all other respects. Id. at 86.

17 Petitioner subsequently filed a petition for review in the California Supreme Court, which was

18 summarily denied on November 16, 2011. (Resp't's Lod. Doc. 5)

19       On February 1, 2013, petitioner filed a petition for a writ of habeas corpus in the

20 Sacramento County Superior Court. (Resp't's Lod. Doc. 6.) Therein, he claimed that his trial

21 counsel rendered ineffective assistance and the trial court erred in failing to instruct the jury on

22 imperfect self-defense and imperfect defense of others. (Id.) On March 15, 2013, that court

23 denied the habeas petition on procedural grounds and on the merits. (Resp't's Lod. Doc. 7.)

24       On February 5, 2013, petitioner filed a petition for a writ of habeas corpus in the

25 California Supreme Court, raising the same claims. (Resp't's Lod. Doc. 8.) On May 15, 2013,

26 that petition was summarily denied. (Id.)

27       Petitioner filed his federal habeas petition in this court on June 20, 2013.

28 /////

5

**II.  Standards of Review Applicable to Habeas Corpus Claims**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision.  Greene v. Fisher, ___ U.S. ___, ___, 132 S. Ct. 38, 44 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, ___ U.S. ___, ___, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, ___ U.S. ___, ___, 132 S. Ct. 2148, 2155 (2012)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct.  Id.  Further, where courts

6

1  of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly

2  established Federal law" governing that issue.  Carey v. Musladin, 549 U.S. 70, 77 (2006).

3        A state court decision is "contrary to" clearly established federal law if it applies a rule

4  contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

5  precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).

6  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

7  writ if the state court identifies the correct governing legal principle from the Supreme Court's

8  decisions, but unreasonably applies that principle to the facts of the prisoner's case.[3]  Lockyer v.

9  Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002

10  (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that

11  court concludes in its independent judgment that the relevant state-court decision applied clearly

12  established federal law erroneously or incorrectly.  Rather, that application must also be

13  unreasonable."  Williams, 529 U.S. at 412.  See also Schriro v. Landrigan, 550 U.S. 465, 473

14  (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

15  review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").

16  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

17  'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v.

18  Richter, 562 U.S. 86,___,131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S.

19  652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal

20  court, a state prisoner must show that the state court's ruling on the claim being presented in

21  federal court was so lacking in justification that there was an error well understood and

22  comprehended in existing law beyond any possibility for fairminded disagreement."  Richter,131

23  S. Ct. at 786-87.

24        If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

25  court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford,

26  _____

27  [3]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

28  384 F.3d 628, 638 (9th Cir. 2004)).

1   527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

2   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

3   2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

4   de novo the constitutional issues raised.").

5          The court looks to the last reasoned state court decision as the basis for the state court

6   judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

7   If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

8   previous state court decision, this court may consider both decisions to ascertain the reasoning of

9   the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a

10  federal claim has been presented to a state court and the state court has denied relief, it may be

11  presumed that the state court adjudicated the claim on the merits in the absence of any indication

12  or state-law procedural principles to the contrary."  Richter, 131 S. Ct. at 784-85.  This

13  presumption may be overcome by a showing "there is reason to think some other explanation for

14  the state court's decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797,

15  803 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims

16  but does not expressly address a federal claim, a federal habeas court must presume, subject to

17  rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, ___ U.S. ___,

18  ___, 133 S. Ct. 1088, 1091 (2013).

19         Where the state court reaches a decision on the merits but provides no reasoning to

20  support its conclusion, a federal habeas court independently reviews the record to determine

21  whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

22  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

23  review of the constitutional issue, but rather, the only method by which we can determine whether

24  a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

25  reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

26  reasonable basis for the state court to deny relief."  Richter, 131 S. Ct. at 784.

27         A summary denial is presumed to be a denial on the merits of the petitioner's claims.

28  Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).  While the federal court cannot analyze

8

1   just what the state court did when it issued a summary denial, the federal court must review the

2   state court record to determine whether there was any "reasonable basis for the state court to deny

3   relief." <u>Richter</u>, 131 S. Ct. at 784. This court "must determine what arguments or theories ...

4   could have supported, the state court's decision; and then it must ask whether it is possible

5   fairminded jurists could disagree that those arguments or theories are inconsistent with the

6   holding in a prior decision of [the Supreme] Court." <u>Id.</u> at 786. The petitioner bears "the burden

7   to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" <u>Walker v.</u>

8   <u>Martel</u>, 709 F.3d 925, 939 (9th Cir. 2013) (quoting <u>Richter</u>, 131 S. Ct. at 784).

9       When it is clear, however, that a state court has not reached the merits of a petitioner's

10   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

11   habeas court must review the claim de novo. <u>Stanley</u>, 633 F.3d at 860; <u>Reynoso v. Giurbino</u>, 462

12   F.3d 1099, 1109 (9th Cir. 2006); <u>Nulph v. Cook</u>, 333 F.3d 1052, 1056 (9th Cir. 2003).

13   **III. Petitioner's Claims[4]**

14       **A. Jury Instruction on Imperfect Self-Defense and Imperfect Defense of Others**

15       Petitioner claims that the trial court's failure to sua sponte instruct the jury at petitioner's

16   trial on imperfect self-defense and imperfect defense of others violated petitioner's right to "have

17   the jury instructed on his theory of the case." (ECF No. 11 at 46.) Petitioner explains that an

18   instruction on "unreasonable self-defense would have provided both a basis for finding a lesser

19   included offense of voluntary manslaughter, and a theory of defense explaining why petitioner

20   acted without malice aforethought." (<u>Id.</u> at 47.) Petitioner argues that "the failure to instruct sua

21   sponte upon a lesser included offense where supported by substantial evidence has been held to

22   violate the due process clause of the Fourteenth Amendment." (<u>Id.</u>)

23       Petitioner notes that, through jury instructions, the trial court restricted the testimony of

24   Dr. Linda A. Barnard, his expert witness on intimate partner battering. (<u>Id.</u> at 49.) Specifically,

25   petitioner's jury was instructed as follows by the trial judge:

26   /////

27

28   _____

    [4] For purposes of clarity, the court will analyze petitioner's claims in the reverse order in which
    they were presented in his federal habeas petition.

1

2

3

Linda A. Barnard's testimony about intimate partner battering syndrome is admissible regarding intimate partner battering and its effects including the nature and effect of physical, emotional or mental abuse on the beliefs, perceptions or behavior of victims of domestic violence.

4

5

6

Although Linda Barnard's testimony cannot answer the ultimate question regarding the defendant's motive or state of mind at the time, such evidence may be relevant in determining whether or not the defendant has formed the intent or mental state required for the crimes charged.

7

8

9

10

You may consider evidence that the defendant may have suffered from intimate partner battering syndrome only for the limited purposes of deciding whether at the time of the charged crime the defendant acted with the intent or mental state for Count One and both theories of first degree murder within Count Two and the lesser crime of second degree murder within Count Two, and the special circumstances alleged in Count Two.

11   (Reporter's Transcript on Appeal (RT) at 1896-97.)  The trial judge made it clear that he would

12   not instruct the jury on theories of imperfect self-defense or defense of others and drew no

13   objection from the defense.  (Id. at 1460-64.)

14        Petitioner notes that he testified at trial that he had been threatened with death and abused

15   by his father for years, and that he feared his father was going to harm or kill him, his mother, or

16   his sisters.  (ECF No. 11 at 50.)  He also notes that Dr. Barnard testified about the effect such

17   abuse could have on the recipient, including "the likely perception of an abused party to perceive

18   serious danger when abuse suddenly escalated as it did in this case."  (Id. at 51.)  Petitioner argues

19   that this evidence warranted the giving of a jury instruction on his defense that he acted with the

20   unreasonable belief that he needed to arrange for his father to be killed because he "unreasonably

21   saw the danger posed to himself, his mother and sisters as imminent."  (Id.)

22        On appeal, petitioner argued that the trial court erred in failing to instruct the jury, sua

23   sponte, on imperfect self-defense and imperfect defense of others.  The California Court of

24   Appeal rejected this argument, reasoning as follows:

25

26

27

28

Citing his evidence of Norik's abusive conduct and the expert testimony concerning intimate partner battering, Abramyan contends the trial court erred by not instructing the jury, sua sponte, concerning voluntary manslaughter based on imperfect self-defense and imperfect defense of others.  We conclude that Abramyan forfeited this contention by failing to object to the instructions (Anderson, supra, 152 Cal.App.4th at p. 927, 61 Cal.Rptr.3d 903)

10

and, in any event, there was no miscarriage of justice because the evidence did not support giving the instructions.

A trial court must instruct, sua sponte, "on all theories of a lesser included offense which find substantial support in the evidence." (People v. Breverman (1998) 19 Cal.4th 142, 162, 77 Cal.Rptr.2d 870, 960 P.2d 1094.)

Here, the trial court did not instruct the jury concerning voluntary manslaughter based on imperfect self-defense and imperfect defense of others.   In denying a motion for new trial, the court gave its reasons for not giving the instructions.   It said:   "There is not substantial evidence to support the giving of self-defense instructions, defense of others instruction, imperfect self-defense instruction, imperfect self-defense [sic] of others instructions in that all we have – we do not have an immediacy in terms of harm that's central to self-defense instructions as it pertains – central.   Self-defense, defense of others, imperfect self-defense, and imperfect defense of others that is a common thread that runs through that." The court was correct.

"For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend.   [Citation.]   If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter.   [Citation.]   To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively reasonable.   [Citations.] . . .   [F]or either perfect or imperfect self-defense, the fear must be of imminent harm.   'Fear of future harm – no matter how great the fear and no matter how great the likelihood of the harm – will not suffice.   The defendant's fear must be of imminent danger to life or great bodily injury.'   [Citation.]"   (People v. Humphrey (1996) 13 Cal.4th 1073, 1082, 56 Cal.Rptr.2d 142, 921 P.2d 1, fn. and italics omitted.)   All the surrounding circumstances, including prior assaults and threats, may be considered in determining whether the accused perceived an imminent threat of death or great bodily injury.   (Id. at p. 1083, 56 Cal.Rptr.2d 142, 921 P.2d 1; see also People v. Michaels (2002) 28 Cal.4th 486, 530–531, 122 Cal.Rptr.2d 285, 49 P.3d 1032.) Evidence Code section 1107 permits admission of expert testimony regarding intimate partner battering, but it does not modify the imminence requirement.[5]   "[B]oth self-defense and defense of others, whether perfect or imperfect, require an actual fear of imminent harm.   [Citation.]"   (People v. Butler (2009) 46 Cal.4th 847, 868, 95 Cal.Rptr.3d 376, 209 P.3d 596, original italics.)

---

[5]   Evidence Code section 1107, subdivision (a) states: "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of criminal charge."

"This definition of imminence reflects the great value our society places on human life.  The criminal law would not sentence to death a person such as the victim in this case for a murder he merely threatened to commit, even if he had committed threatened murders many times in the past and had threatened to murder the defendant; it follows that the criminal law will not even partially excuse a potential victim's slaying of his attacker unless more than merely threats and a history of past assaults is involved."  (People v. Aris (1989) 215 Cal.App.3d 1178, 1189, 264 Cal. Rptr. 167, overruled on another ground in People v. Humphrey, supra, 13 Cal.4th at p. 1089, 56 Cal.Rptr.2d 142, 921 P.2d 1.)

Abramyan testified that, at the time of the shooting, Norik posed no danger to him, to his mother, or to his sisters.  He knew that Norik posed no danger to him or others at the time of the killing. Abramyan asserts, however, that, despite his own testimony that Norik posed no danger to him, to his mother, or to his sisters at the time of the shooting, the jury could conclude that he feared imminent harm to himself or to others because he was the victim of intimate partner battering.[6]  The problem with this assertion is that the evidence was to the contrary – he did not fear imminent harm from Norik at the time of the shooting.

When asked on direct examination why he had his father killed, Abramyan responded:  "Because all the abuse that he did to my mom, my sisters and myself throughout the past ten years that I know of. I just really felt that he was going to kill my mom and my sisters. [¶] . . . [¶] . . . I felt like as a man I had to stand up and take control of my family, you know, so me, mom and sisters could be happy again. [¶] . . .  He caused fear and terror in the house every time he was around."

Abramyan's testimony, as well as that of his mother and sisters, established past abuse by Norik.  And Abramyan's testimony was evidence that he feared Norik would continue the abuse in the future.  But it did not establish imminence, or that Abramyan even believed harm was imminent.

The expert testimony concerning intimate partner battering does not help in this regard.   The testimony supported Abramyan's testimony that he feared future harm from Norik; however, like Abramyan's testimony, it did not establish fear of imminent harm. Instead, the actual evidence of Abramyan's state of mind was that he did not fear imminent harm.   Norik had not threatened Abramyan, and Abramyan knew Norik was not armed.  He knew that, when he returned to the car, Norik would not harm him.  Norik posed no immediate danger to Abramyan, to his mother, or to his sisters. Because there was no evidence of fear of imminent harm, the evidence was insufficient to support an instruction on voluntary

---

[6]  This is an obvious broadening of the term "intimate partner battering," as Abramyan was the victim's son, not intimate partner.  However, this is the general theory Abramyan relies on, and, because the reliance is misplaced on the facts, we need not discuss whether the theory properly extends to those who are not intimate partners.

manslaughter based on imperfect self-defense and imperfect defense of others.

In support of his argument that the evidence was sufficient to support an instruction on voluntary manslaughter, Abramyan cites cases supporting an imperfect self-defense theory in which the defendants actually believed harm was imminent even though a reasonable person would not have believed it.  (See In re Walker (2007) 147 Cal.App.4th 533, 54 Cal. Rptr.3d 411 [evidence supported finding that defendant had actual fear of imminent harm even if the fear was unreasonable], People v. Aris, supra, 215 Cal.App.3d 1178, 264 Cal. Rptr. 167 [defendant had actual belief in imminent harm even though victim sleeping].)  These cases are unhelpful to Abramyan because the evidence here is that he did not actually fear imminent harm to himself or others.

Finally, in his reply brief, Abramyan asserts that because he was not the actual killer we should consider his mental state when he aided and abetted the killing.  He claims we should determine his mental state from the failed plan for Barron to intercept Norik as Norik entered the apartment.  This new argument is factually untenable because the original plan to kill Norik at the apartments did not result in a killing.  Only the later plan, proposed by Abramyan, to have Norik ambushed at the video store resulted in a killing.  At the video store, Abramyan aided and abetted the murder but had no actual fear of imminent harm.

The trial court did not err by not giving instructions concerning voluntary manslaughter based on imperfect self-defense and imperfect defense of others.

Battle, 198 Cal.App.4th at 71-74.

Petitioner raised this same claim in his habeas petition filed in the Sacramento County Superior Court.  (Resp't's Lod. Doc. 6 at 46-52.)  The Superior Court first rejected petitioner's arguments on the grounds that his habeas petition was untimely and that, in any event, the claims contained therein had been raised and rejected on appeal.  (Resp't's Lod. Doc. 7 at 1-2.)  The Superior Court also concluded that petitioner had failed to show "any reason why this court should now conclude any differently than . . . did the Third District Court of Appeal on the appeal in this case."  (Id. at 4.)  The Superior Court reasoned, in part, as follows:

Specifically, in the trial court before sentencing, petitioner had made a motion for a new trial based on these same grounds, at which time petitioner attached a report from Dr. Barnard detailing Dr. Barnard's opinions on the case.  The trial court denied the motion for a new trial.  On appeal, petitioner claimed that the trial court erred in not sua sponte instructing the jury on voluntary manslaughter based on imperfect self-defense and imperfect

13

1  |  defense of others.   The Third District Court of Appeal, in its
2  |  opinion on appeal affirming the judgment, held that the evidence presented did not support the giving of the instructions . . . .

3  |  Petitioner raised his basic habeas claim in a motion for new trial, at
4  |  which time he presented similar evidence regarding what Dr. Barnard additionally could have testified to; that was rejected, and that rejection was essentially upheld by the Third District on the
5  |  appeal.  It is because petitioner himself testified at trial that he did not, in fact, fear imminent harm to him, his mother, or his sisters at
6  |  the time of the shooting, that he was not entitled to an imperfect self-defense or imperfect defense of others instruction on either the
7  |  murder or the conspiracy charge.  Any further testimony by Dr. Barnard beyond what was given at the trial would not have made
8  |  any difference in the outcome of the trial.  As such, the claim is barred from habeas review by <u>Waltreus</u>, and does not meet any
9  |  exception to that bar.

10  |  (<u>Id.</u> at 3-4.)

11  |  Respondent argues that the California Court of Appeal's conclusion that petitioner

12  |  forfeited his jury instruction claim by failing to object to the trial court's failure to give jury

13  |  instructions on imperfect self-defense and imperfect defense of others, and the Sacramento

14  |  County Superior Court's rejection of the claim on the basis that petitioner's petition was

15  |  untimely, constitute state procedural bars which preclude this court from addressing the merits of

16  |  this jury instruction claim.  (ECF No. 18 at 24.)

17  |  As a general rule, "[a] federal habeas court will not review a claim rejected by a state

18  |  court 'if the decision of [the state] court rests on a state law ground that is independent of the

19  |  federal question and adequate to support the judgment."  <u>Walker v. Martin</u>, 562 U.S.___, ___,

20  |  131 S. Ct. 1120, 1127 (2011) (quoting <u>Beard v. Kindler</u>, 558 U.S. ___, ___, 130 S. Ct. 612, 615

21  |  (2009).  <u>See also</u> <u>Maples v. Thomas</u>, ___U.S.___, ___, 132 S. Ct. 912, 922 (2012); <u>Greenway v.</u>

22  |  <u>Schriro</u>, 653 F.3d 790, 797 (9th Cir. 2011); <u>Calderon v. United States District Court (Bean)</u>, 96

23  |  F.3d 1126, 1129 (9th Cir. 1996) (quoting <u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991)).

24  |  However, a reviewing court need not invariably resolve the question of procedural default prior to

25  |  ruling on the merits of a claim.  <u>Lambrix v. Singletary</u>, 520 U.S. 518, 524-25 (1997); <u>see also</u>

26  |  <u>Franklin v. Johnson</u>, 290 F.3d 1223, 1232 (9th Cir. 2002): ("Procedural bar issues are not

27  |  infrequently more complex than the merits issues presented by the appeal, so it may well make

28  |  sense in some instances to proceed to the merits if the result will be the same"); <u>Busby v. Dretke,</u>

14

1    359 F.3d 708, 720 (5th Cir. 2004) (noting that although the question of procedural default should

2    ordinarily be considered first, a reviewing court need not do so invariably, especially when the

3    issue turns on difficult questions of state law).  Thus, where deciding the merits of a claim proves

4    to be less complicated and time-consuming than adjudicating the issue of procedural default, a

5    court may exercise discretion in its management of the case to reject the claim on its merits and

6    forgo an analysis of procedural default.  See Batchelor v. Cupp, 693 F.2d 859, 864 (9th Cir. 1982)

7    (procedural default issues "are almost always more complicated and time consuming than are the

8    merits of the petitioner's federal claim").  Under the circumstances presented here, this court

9    finds that petitioner's jury instruction error claim can be resolved more easily by addressing it on

10   the merits.

11          The United States Supreme Court has held that the failure to instruct on a lesser included

12   offense in a capital case is constitutional error if there was evidence to support the instruction.

13   Beck v. Alabama, 447 U.S. 625, 638 (1980).  The Supreme Court has not decided, however,

14   whether this rationale also extends to non-capital cases.  The Ninth Circuit, like several other

15   federal circuits, has declined to extend Beck to find constitutional error arising from the failure to

16   instruct on a lesser included offense in a non-capital case.  See Solis v. Garcia, 219 F.3d 922, 929

17   (9th Cir. 2000); Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a

18   state trial court to instruct on lesser included offenses in a non-capital case does not present a

19   federal constitutional question."); James v. Reese, 546 F.2d 325, 327 (9th Cir. 1976) ("Failure of

20   a state court to instruct on a lesser offense fails to present a federal constitutional question and

21   will not be considered in a federal habeas corpus proceeding").   Accordingly, the decision of the

22   California courts denying petitioner relief as to this claim was not contrary to United States

23   Supreme Court authority as set forth in the Beck decision.  Further, to find a constitutional right

24   to a lesser-included offense instruction here would require the application of a new rule of law in

25   the context of a habeas petition, something the court cannot do under the holding in Teague v.

26   Lane, 489 U.S. 28 (1989).  See Solis, 219 F.3d at 929 (federal habeas relief for a state court's

27   failure to instruct on a lesser included offense in non-capital case was barred by Teague because it

28   would require the application of a new constitutional rule); Turner v. Marshall, 63 F.3d 807, 819

1    (9th Cir. 1995) (same), overruled on other grounds by Tolbert v. Page, 182 F.3d 677 (9th Cir.

2    1999) (en banc).

3        Petitioner's jury instruction error claim also fails on its merits.  In general, a challenge to

4    jury instructions does not state a federal constitutional claim.  Engle v. Isaac, 456 U.S. 107, 119

5    (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  An error in a state court

6    determination that a jury instruction was not warranted under state law cannot form the basis for

7    federal habeas relief.  Estelle, 502 U.S. at 67-68; Menendez v. Terhune, 422 F.3d 1012, 1029 (9th

8    Cir. 2005).  Rather, "a claim that a court violated a petitioner's due process rights by omitting an

9    instruction requires a showing that the error 'so infected the entire trial that the resulting

10   conviction violate[d] due process.'"  Menendez, 422 F.3d at 1029 (citations omitted.  In addition,

11   "a state trial court's finding that the evidence does not support a claim of imperfect self-defense is

12   entitled to a presumption of correctness on federal habeas review."  Id. (citing Hartman v.

13   Summers, 120 F.3d 157, 161 (9th Cir. 1997)).

14       Where the challenge is to a refusal or failure to give an instruction, the petitioner's burden

15   is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be

16   prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  See

17   also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (same).  A criminal defendant "is

18   entitled to adequate instructions on the defense theory of the case."  Conde v. Henry, 198 F.3d

19   734, 739 (9th Cir. 2000).  Failure to instruct on the theory of defense violates due process if "'the

20   theory is legally sound and evidence in the case makes it applicable .'"  Clark v. Brown, 450 F.3d

21   898, 904-905 (9th Cir. 2006) (quoting Beardslee v. Woodford, 358 F.3d 560, 577 (9th Cir.

22   2004)).  However, a defendant is not entitled to the giving of jury instructions embodying the

23   defense theory if the evidence does not support that theory.  Mathews v. United States, 485 U.S.

24   58, 63 (1988) ("a defendant is entitled to an instruction as to any recognized defense for which

25   there exists evidence sufficient for a reasonable jury to find in his favor"); Menendez, 422 F.3d at

26   1029) (petitioner was not entitled to federal habeas relief on his claim that the trial court violated

27   his right to due process in failing to give a jury instruction on imperfect self-defense because the

28   evidence introduced at trial did not support a finding of imminent peril); Lewis v. Runnels, No. C

16

1    04-2857 MJJ (PR), 2007 WL 2701791, at *17-18 (N.D. Cal. Sept. 13, 2007) (petitioner not

2    entitled to federal habeas relief on jury instruction error claim where a defense of others

3    instruction was not called for in light of the evidence introduced at trial).

4         The California Court of Appeal explained that in order to support a defense of imperfect

5    self-defense or imperfect defense of others, the defendant must show that he feared imminent

6    harm from the victim at the time of the killing.  Battle, 198 Cal.App.4th at 72.  This court is

7    bound by the California Court of Appeal's interpretation of state law.  Aponte v. Gomez, 993

8    F.2d 705, 707 (9th Cir. 1993).  Based on the evidence introduced at his trial, petitioner could not

9    make this required showing.  As noted above, petitioner testified that at the time of the shooting

10   he knew that his father posed no danger to him, his mother, or his sisters.  (RT at 1441-42.)

11   Similarly, the testimony of Dr. Barnard established that petitioner did not fear imminent harm at

12   the time of the killing, but only a more generalized fear of harm from his father.  As observed by

13   the California Court of Appeal, the evidence "did not establish imminence, or that Abramyan

14   even believed harm was imminent."  Battle, 198 Cal.App.4th at 73.

15        Because the evidence in this case supported neither a defense of imperfect self-defense

16   nor imperfect defense of others, the trial court did not violate petitioner's federal constitutional

17   rights in failing to sua sponte instruct the jury on those defenses.  Put another way, the trial court

18   did not render petitioner's trial fundamentally unfair in failing to give a jury instruction on

19   defenses that were not supported by the evidence introduced at trial.  See Mathews, 485 U.S. at

20   63.  Accordingly, petitioner is not entitled to federal habeas corpus relief on this claim.

21        **B.  Ineffective Assistance of Counsel**

22        Petitioner also claims that his trial counsel rendered ineffective assistance in failing to

23   present defenses of imperfect self-defense and imperfect defense of others, or to argue "that the

24   petitioner lacked the requisite malice to commit murder because he believed that the victim

25   presented an imminent threat to himself and to his immediate family."  (ECF NO. 11 at 12, 39-

26   46.)

27        Petitioner explains that his trial counsel presented a defense based, in part, on the theory

28   that "petitioner hired Isaiah Barron to kill his father based on the effects of Intimate Partner

17

1  Battering." (Id. at 41.) This theory was supported by the testimony of expert witness Dr.

2  Barnard. (Id.) However, "the [trial] court permitted counsel only to present expert testimony as

3  to the question of intent of the defendant and did not instruct on imperfect self-defense . . . or

4  imperfect defense of others. . . ." (Id. at 42.) Petitioner complains that his trial counsel did not

5  request jury instructions on imperfect self-defense and defense of others and did not request an

6  evidentiary hearing "to establish Dr. Barnard's ability to testify in a manner giving rise to a sua

7  sponte requirement for the court to instruct on imperfect self-defense or at least grant a request for

8  the instruction by counsel." (Id.) He argues that an evidentiary hearing would have permitted his

9  trial counsel to show "the relevance of the abuse to the entire family as it pertains to the impact on

10  Petitioner and his perception of danger to himself and his family." (Id.)

11       Petitioner also argues that his trial counsel should have more extensively questioned Dr.

12  Barnard "as to the issue of fear of imminent harm." (Id.) Petitioner has attached to his pending

13  petition a declaration from Dr. Barnard, in which she states, among other things, that: (1)

14  "leading up to this incident, there was fear of imminent harm that extended for several days, with

15  Vardan perceiving that at any moment his father was going to kill them all;" and (2) this case

16  truly is about imminent danger and its perception in the context of Intimate Partner Battering and

17  its Effects." (ECF No. 11-11 at 4.) Petitioner argues that his trial counsel "failed to elicit

18  information about the unique family dynamic and distinct pattern abuse that were necessary for

19  members of the jury to understand the implication of [intimate partner battering] as they relate to

20  this petitioner's capacity for threat recognition." (ECF No. 11 at 43.)

21       Petitioner also complains that his trial counsel improperly focused exclusively on the issue

22  of petitioner's intent, rather than the question of whether petitioner perceived an imminent danger

23  from his father. (Id.) In support of this argument petitioner has filed the declaration of Jan David

24  Karowsky, a criminal practitioner with extensive experience in the defense of those accused with

25  crimes. Attorney Karowsky declares that, in his opinion, petitioner's counsel should have raised

26  a defense "based exclusively on an intimate partner battering defense – defense of others." (ECF

27  No. 11-17 at 3.) He also declares that petitioner's trial counsel did not adequately question Dr.

28  Barnard "to support a defense of others argument." (Id.) Attorney Karowsky also expresses the

belief that if petitioner's trial counsel had pursued a defense based on imperfect self-defense "a result different from a conviction for first degree murder would have occurred."  (Id. at 4.)

Petitioner next argues that his trial counsel failed to introduce sufficient evidence with regard to petitioner's relationship with his father.  (ECF No. 11 at 43-44.)  He contends that his trial counsel should have questioned Dr. Barnard about the effect of battering on petitioner's apparent lack of emotion when he testified about experiencing violence in his family.  (Id. at 44.)  Petitioner argues there was no "conceivable tactical basis" for his trial counsel to introduce evidence on intimate partner battering without tying that evidence to a defense of imperfect self-defense or defense of others.  (Id.)  He speculates that trial counsel "simply did not consider the strategy."  (Id.)  Petitioner bases this speculation on Dr. Barnard's declaration that counsel did not mention to her "issues of immediacy, imminence, self-defense or defense of others."  (Id.)

Finally, petitioner faults his trial counsel for failing to call non-family members to testify about the abuse of family members carried out by his father.  He has filed the declaration of Lori Brown, a private investigator, who declares that she interviewed several individuals who were aware of the abuse occurring in the Abramyan household, especially towards Mrs. Abramyan.  (ECF No. 11-16 at 1-4.)  Investigator Brown suggests that petitioner's trial counsel apparently simply chose not to call these persons as witnesses at his trial.  (Id.)

Petitioner argues that if his trial counsel had pursued a defense of imperfect self-defense or defense of others, "the outcome would have been more favorable."  (ECF No. 11 at 45.)  He argues that it was unreasonable for his trial counsel to focus on the issue of petitioner's intent to kill his father, when the jury was presented with overwhelming evidence that petitioner did, in fact, have the intent to kill his father.  (Id.)  Instead, he argues, his trial counsel should have attempted "to negate malice through the viable option of presenting evidence in support of a defense of imperfect self-defense or imperfect defense of others."  (Id.)  In short, petitioner claims that "he was deprived of competent counsel who simply ignored a meritorious defense."  (ECF No. 21 at 2.)

On appeal petitioner raised a similar claim, arguing that his trial counsel rendered ineffective assistance in failing to "request instructions and to make an argument that, based on

imperfect self-defense and imperfect defense of others, he did not harbor malice." <u>Battle</u>, 198 Cal.App.4th at 76.  The California Court of Appeal concluded that petitioner's claim was "without merit because the facts did not support instructions or argument based on imperfect self-defense or imperfect defense of others." <u>Id.</u>  Specifically, the court found that "[b]ecause the evidence did not support an argument that Abramyan harbored no malice because he actually feared imminent harm to himself or others, trial counsel competently did not make the argument." (<u>Id.</u>)

Petitioner raised his ineffective assistance of counsel claim again in his habeas petition filed in the Sacramento County Superior Court.  (Resp't's Lod. Doc. 6 at 35-46.)  In that petition, petitioner claimed:

> That his trial defense counsel was ineffective in failing to request a jury instruction on imperfect self-defense and imperfect defense of others, and in failing to request an evidentiary hearing under Evid. Code § 402 to establish Dr. Barnard's ability to testify in a manner that would have given rise to a sua sponte requirement for the court to give such instructions.  Petitioner claims that an Evid. Code § 402 hearing would additionally have permitted competent counsel to show the relevance of the abuse to the entire family as it pertains to the impact on petitioner and his perception of danger to himself and his family.  Petitioner claims that Dr. Barnard also should have testified as to the issue of fear of imminent harm, because petitioner had an extensive and severe history of abuse and consistently perceived danger at a very high level, thinking that at any moment his father, who was the victim, was going to kill them all.  In support, petitioner attaches a declaration from Dr. Barnard, speculating that it was likely that petitioner was in imminent fear of his father when he first contacted his codefendants to kill his father.  Petitioner claims that trial defense counsel questioned Dr. Barnard on the witness stand at trial only for a brief period of time and failed to elicit information about the unique family dynamic and distinct pattern of abuse.  Petitioner claims that there was no tactical basis for trial defense counsel to attempt to introduce intimate partner battering evidence only to negate malice, without at least attempting to bring the evidence in toward an imperfect self-defense argument.  Petitioner also claims that trial defense counsel did not call any non-family members to testify to the abuse, to corroborate the family's testimony.

(Resp't's Lod. Doc. 7 at 2.)

As noted above, the Sacramento County Superior Court first denied petitioner's habeas claims on the grounds that his petition was untimely and that, in any event, the claims contained therein had been raised and rejected on appeal.  (<u>Id.</u> at 1-2.)  The Superior Court also agreed with

the California Court of Appeal that petitioner's claims should be rejected on the merits. The

Superior Court reasoned as follows:

> The Third District noted the trial court's denial of the motion for new trial and held that the trial court had been correct. The Third District explained that both perfect and imperfect self-defense and defense of others require an actual fear of imminent harm, and that petitioner himself at trial testified that at the time of the shooting, the victim posed no danger to him, his mother, or his sisters. The Third District rejected petitioner's argument that despite his own testimony, the jury could have concluded that he feared imminent harm to himself or to others because he was the victim of intimate partner battering, holding instead that "[t]he problem with this assertion is that the evidence was to the contrary – he did not fear imminent harm from [the victim] at the time of the shooting. . . . . [Petitioner's] testimony, as well as that of his mother and sisters, established past abuse by [the victim] . . . . But it did not establish imminence, or that [petitioner] even believed harm was imminent" [emphasis added]. The Third District also found that the expert testimony that was presented helped in this regard, because "it did not establish fear of imminent harm. Instead, the actual evidence of [petitioner's] state of mind was that he did not fear imminent harm. [The victim] had not threatened [petitioner], and [petitioner] knew [the victim] had not threatened [petitioner], and [petitioner] knew [the victim] was not armed. [Petitioner] knew that when he returned to the car, [the victim] would not harm him. [The victim] posed no immediate danger to [petitioner], to his mother, or to his sisters. Because there was no evidence of fear of imminent harm, the evidence was insufficient to support an instruction on voluntary manslaughter based on imperfect self-defense and imperfect defense of others." The Third District also rejected a similar claim with regard to failure to instruct on imperfect self-defense and imperfect defense of others with regard to the conspiracy charge.
>
> Petitioner raised his basic habeas claim in a motion for new trial, at which time he presented similar evidence regarding what Dr. Barnard additionally could have testified to; that was rejected, and that rejection was essentially upheld by the Third District on the appeal. It is because petitioner himself testified at trial that he did not, in fact, fear imminent harm to him, his mother, or his sisters at the time of the shooting, that he was not entitled to an imperfect self-defense or imperfect defense of others instruction on either the murder or the conspiracy charge. Any further testimony by Dr. Barnard beyond what was given at the trial would not have made any difference in the outcome of the trial. As such, the claim is barred from habeas review by Waltreus, and does not meet any exception to that bar.
>
> Nor does petitioner show any reason why this court should now conclude any differently than did the trial judge at the time of the motion for new trial, or any differently than did the Third District Court of Appeal on the appeal in this case."

(Id. at 3-4.)

21

As with respect to petitioner's other claims addressed above, respondent argues that the Sacramento County Superior Court's rejection of petitioner's claims on the basis that his habeas petition was untimely constitutes a state procedural bar which precludes this court from addressing the merits of petitioner's claim of ineffective assistance of counsel.  (ECF No. 18 at 15.)  However, this court will again assume that the claim is not procedurally barred and address it on the merits.

The clearly established federal law governing ineffective assistance of counsel claims is that set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  To succeed on a Strickland claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense."  Id. at 687.  Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases."  Id. at 687–88 (internal quotation marks omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"  Richter, 131 S. Ct. at 787-88 (quoting Strickland, 466 U.S. at 687).

A reviewing court is required to make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 669.  See also Richter, 131 S. Ct. at 789 (same).  Reviewing courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.  There is in addition a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).  This presumption of reasonableness means that the court must "give the attorneys the benefit of the doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did."  Cullen v. Pinholster, ___ U.S. ___, ___, 131 S. Ct. 1388, 1407 (2011) (internal quotation marks and alterations omitted).

/////

22

1   Prejudice is found where "there is a reasonable probability that, but for counsel's

2   unprofessional errors, the result of the proceeding would have been different." Strickland, 466

3   U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the

4   outcome." Id.

5   The California Court of Appeal and the Sacramento County Superior Court both rejected

6   petitioner's claim that his trial counsel rendered ineffective assistance in failing to investigate and

7   present defenses of imperfect self-defense or imperfect defense of others because the evidence

8   introduced at petitioner's trial simply did not support such a defense under California law. As

9   explained above, in order to succeed on such a defense petitioner was required to show that he

10   was in fear of imminent harm when he killed the victim. However, petitioner testified at trial that

11   he was not in imminent fear of harm when his father was killed at the video store. Rather, he

12   explained that he wanted his father killed because he was afraid for the safety of his mother

13   and/or sisters at some point in the future. As noted by the Sacramento County Superior Court:

> 14   It is because petitioner himself testified at trial that he did not, in
> fact, fear imminent harm to him, his mother, or his sisters at the
> 15   time of the shooting, that he was not entitled to an imperfect self-
> defense or imperfect defense of others instruction on either the
> 16   murder or the conspiracy charge. Any further testimony by Dr.
> Barnard beyond what was given at the trial would not have made
> 17   any difference in the outcome of the trial.

18   (Resp't's Lod. Doc. 7 at 4.)

19   Petitioner cannot show that his trial counsel was ineffective in failing to present defenses

20   without factual or legal support. It is certainly possible that counsel chose not to present such a

21   defense because there was insufficient evidence to support it. In addition, petitioner's argument

22   that such a defense would have succeeded if it had been pursued is not supported by the record.

23   The argument is therefore insufficient to establish prejudice with respect to this claim.

24   Under the facts of this case, the decision of the state courts that petitioner's trial counsel

25   did not render ineffective assistance in failing to present defenses of imperfect self-defense or

26   imperfect defense of others is not contrary to or an unreasonable application of federal law as set

27   forth by the Supreme Court in Strickland. Accordingly, petitioner is not entitled to federal habeas

28   relief on his ineffective assistance of counsel claim.

1    **IV.  Conclusion**

2           For the reasons set forth above, and although the circumstances presented by this case are

3    no doubt tragic, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

4    habeas corpus be denied.

5           These findings and recommendations are submitted to the United States District Judge

6    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

7    after being served with these findings and recommendations, any party may file written

8    objections with the court and serve a copy on all parties.  Such a document should be captioned

9    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

10   shall be served and filed within fourteen days after service of the objections.  Failure to file

11   objections within the specified time may waive the right to appeal the District Court's order.

12   <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir.

13   1991).  In his objections petitioner may address whether a certificate of appealability should issue

14   in the event he files an appeal of the judgment in this case.  <u>See</u> Rule 11, Federal Rules Governing

15   Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

16   enters a final order adverse to the applicant).

17   Dated:  October 8, 2014

18

19                                         _____

20                                         DALE A. DROZD
                                           UNITED STATES MAGISTRATE JUDGE

21   DAD:8:
     Abramyan258.hc

22

23

24

25

26

27

28